NOT DESIGNATED FOR PUBLICATION

No. 118,831

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

CROSSLAND CONSTRUCTION COMPANY, INC.,
*Appellant*,

v.

OTIS ELEVATOR COMPANY and LIBERTY MUTUAL INSURANCE COMPANY,
*Defendants*,

and

KANSAS STATE UNIVERSITY and TREANOR ARCHITECTS, P.A.,
*Appellees*.

MEMORANDUM OPINION

Appeal from Riley District Court; MERYL D. WILSON, judge. Opinion filed December 28, 2018. Affirmed.

*Stephen R. Miller* and *Toby C. Hausner*, of Miller Schirger LLC, of Kansas City, Missouri, and *P. Bernard Irvine*, of Morrison Frost Olsen Irvine & Schartz LLP, of Manhattan, for appellant.

*Kenton E. Snow*, *Scott C. Grier*, and *Joel H. Driskell*, of Rouse Frets Gentile Rhodes LLC, of Leawood, for appellee Treanor Architects, P.A.

*Wyatt A. Hoch*, of Foulston Siefkin LLP, of Wichita, and *David R. Green*, of the same firm, of Overland Park, for appellee Kansas State University.

*Miriam E. C. Bailey* and *Sharon Kennedy*, of Polsinelli PC, of Kansas City, Missouri, for amicus curiae Kansas Chamber of Commerce.

1

*Robert P. Burns*, of Robert P. Burns P.A., of Wichita, for amicus curiae Associated General Contractors of Kansas, Inc.

Before ARNOLD-BURGER, C.J., GREEN, J., and ROBERT J. FREDERICK, District Judge, assigned.

PER CURIAM:  Crossland Construction Company, Inc. (Crossland) appeals the trial court's judgment granting Kansas State University's (KSU) and Treanor Architects, P.A.'s (Treanor) motions to dismiss. The trial court ruled that Crossland had failed to comply with the Kansas Judicial Review Act (KJRA) before suing KSU for declaratory judgment. Crossland's suit against KSU contained two contract-related claims for relief: (1) a request for interpretation—through a declaratory judgment—of the project elevator specifications regarding what kind of elevator system was to be installed in the residence hall and, in the alternative, (2) a claim for damages against KSU for its alleged breach of contract denying Crossland's Proposed Change Order 126 (PCO 126) for 1.37 million dollars for the iControl elevator system.

The trial court concluded that Crossland had failed to exhaust administrative remedies as required under the KJRA. Based on Crossland's failure to exhaust administrative remedies, the trial court dismissed Crossland's declaratory judgment action and breach of contract claims for lack of jurisdiction. The trial court also granted Treanor's motion to dismiss because it was not a necessary party to the lawsuit.

After the trial court's decision, Crossland, Otis Elevator Company (Otis), and Otis' insurer, Liberty Mutual Insurance Company (Liberty Mutual) agreed to voluntarily dismiss their claims against one another without prejudice pending this appeal. Thus, Otis and Liberty Mutual are not parties to this appeal.

On appeal, Crossland argues that the trial court erred when it granted KSU's and Treanor's motions to dismiss for the following reasons: (1) because breach of construction contract claims are not bound by the KJRA; (2) because parties cannot contractually negotiate for administrative remedies; (3) because its contractually negotiated administrative remedies were otherwise inadequate; and (4) because it otherwise exhausted available administrative remedies. The Kansas Chamber of Commerce and Associated General Contractors of Kansas, Inc., have filed amicus briefs supporting Crossland's contention that breach of construction contract claims do not fall within the scope of the KJRA.

KSU and Treanor, however, maintain that the trial court correctly dismissed Crossland's breach of contract claims for failure to exhaust administrative remedies. Treanor also argues that the trial court correctly dismissed Crossland's breach of contract claim against it because it was not a necessary party. But KSU's and Treanor's primary argument on appeal is that this court lacks jurisdiction because the trial court never entered a final judgment since Crossland, Otis, and Liberty Mutual voluntarily dismissed their claims against one another without prejudice.

For reasons stated later, we conclude that we have jurisdiction to consider Crossland's appeal. We further conclude that because Crossland failed to exhaust its contractually negotiated administrative remedies, the trial court properly dismissed Crossland's breach of contract claims against KSU and Treanor for lack of jurisdiction. Accordingly, we affirm.

KSU and Crossland entered into a contract where Crossland served as the prime contractor in the construction of a new residence hall on the KSU campus. Treanor served as the project architect in the construction of the new residence hall. Treanor and KSU had entered into a contract where Treanor agreed to be the project architect/engineer for the construction of the residence hall. The Kansas Department of

3

Administration (DOA) was involved in the hiring of Treanor, as it was the Office of Facilities and Property Management (OFPM) within the DOA that negotiated Treanor's hiring. Further, KSU and Crossland's contract stated that Treanor was "retained by and [] responsible to the Secretary of Administration and the [OFPM]." In addition to the preceding contracts, Crossland entered into a subcontract with Otis to install the elevator in the new residence hall. Under the subcontract, Crossland agreed to pay Otis $1,306,655.

A dispute arose between Crossland and Otis when Crossland asked Otis to install the "iControl" system in the elevator. Otis, however, wanted to install the "Elevonic" system in the elevator. The Elevonic system was Otis' "proprietary controller," which only Otis could service. But the iControl system was "an open-architecture control system that allow[ed] the owner to perform its own maintenance work." Otis argued that nothing under the elevator specifications created by Treanor and adopted by KSU required the installation of the iControl system. Under both Crossland's contract with KSU and subcontract with Otis, the elevator specifications constituted part of the respective contracts.

On April 3, 2015, Crossland submitted Otis' shop drawings that included the Elevonic system in it to Treanor. But Treanor rejected the shop drawings with the Elevonic system in it, interpreting the contracts as requiring the installation of the iControl. On April 8, 2015, Crossland "accepted as true Treanor's determination . . .[,] rejecting Otis' Elevonic controller . . . request." On April 23, 2015, Crossland gave Otis a "Notice of Failure of Performance," giving Otis the opportunity to install the iControl system at no additional cost if it did so promptly. On May 7, 2015, however, Otis wrote Crossland that it would not install the iControl system because the elevator specifications allowed it to install the Elevonic system.

4

On May 15, 2015, Crossland invoked Article 10.1.2 of the subcontract, terminating the subcontract if Otis did not begin to install the iControl system within seven days. On May 19, 2015, Otis responded that it would not install the iControl system; thus, the subcontract was terminated as of that date.

Following the termination of the Crossland and Otis' subcontract, Crossland hired other subcontractors to complete the elevator work for the residence hall. These subcontractors agreed to install the iControl system. Because installation of the iControl was more expensive and because Otis had been Crossland's lowest original bidder, Crossland had to pay the new subcontractors more. On June 22, 2015, Crossland entered into a subcontract with ThyssenKrupp Elevator Americas for $1,250,550 to install most of the elevator system in the residence hall. A second company completed other work.

On November 3, 2015, Crossland sued Otis in federal court for breach of contract resulting in a loss of $1,237,535. Otis denied liability and counterclaimed for breach of contract and reasonable attorney fees. Crossland asked that KSU help provide it with documents in preparation for its federal case. Crossland's counsel met with different people who worked for Treanor and KSU during the winter of 2016. Crossland's counsel, however, believed that neither Treanor nor KSU were providing "meaningful assistance" with Crossland's federal case against Otis.

Therefore, on April 1, 2016, Crossland submitted PCO 126, requesting $1,371,498.70 "as compensation for the additional expense it incurred related to the use of the iControl." Crossland admitted that it submitted PCO 126 because it feared it would "never recover[] the $1.3 million from Otis." Under Article 12 of the Crossland and KSU's contract, Crossland could request additional payment through a PCO. But the PCO had to be approved by several parties, including Treanor and KSU.

On April 25, 2016, Treanor recommended to KSU that KSU reject PCO 126. KSU accepted Treanor's recommendation. A copy of Treanor's recommendation to KSU, with a stamp stating "not approved" was sent to Crossland that same day.

On May 3, 2016, Crossland sent a letter to the Campus Planning and Project Management Office at KSU stating: "We received your email dated April 25, 2016, 6:29pm rejecting PCO-126. We intend to proceed forward with a formal claim and would appreciate your identifying the University Counsel our attorney should contract regarding next steps." On May 5, 2016, KSU personnel referred Crossland to a staff attorney within the Office of the Chief Counsel of the DOA.

Crossland's counsel attempted negotiation with the DOA, KSU, and Treanor during May and June of 2016, with the hope that Crossland would receive some compensation through alternative dispute resolution. Eventually, Crossland dismissed its federal case against Otis. On June 27, 2016, KSU notified Crossland's counsel that it had hired outside counsel to specifically consider "the matter." Then, on July 1, 2016, KSU's outside counsel told Crossland that KSU had no intention to proceed with any alternative dispute resolution. As a result, on July 8, 2016, Crossland brought this current action against KSU, Treanor, Otis, and Liberty Mutual.

Crossland's petition had several counts. Crossland's main claim was a declaratory judgment action, requesting that the trial court determine whether the elevator specifications required Otis to install the iControl system. Crossland's remaining alternative claims were as follows: (1) that Otis breached its subcontract by refusing to install the iControl system, entitling Crossland to $1,448,168.63 in damages, plus attorney fees and expenses; (2) that Liberty Mutual breached its performance bond indemnifying Crossland if Otis breached its subcontract, entitling Crossland to liquid damages, actual damages, attorney fees, and expenses; (3) that KSU breached its contract (a) by making the iControl system installation a requirement for Otis when no such

6

language existed under the elevator specifications and (b) by not granting PCO 126, entitling Crossland to $1,379,593.70 in damages, plus attorney fees and expenses.

KSU moved to dismiss Crossland's petition. KSU argued that the trial court lacked jurisdiction over Crossland's claims "because Crossland (1) failed to exhaust administrative remedies [as required by the KJRA] and (2) failed to timely petition for judicial review as required by the KJRA." Specifically, KSU argued that legal authority required parties to bring breach of contract claims against a state agency under the KJRA. KSU argued that Crossland failed to exhaust administrative remedies because Crossland did not comply with Article 16(G) of its contract. Article 16(G) stated that Crossland must bring claims about the project architect's adverse decisions to the attention of the director of the OFPM within 10 days of the project architect's adverse decision.

KSU also argued that Crossland's claims were untimely because Crossland failed to timely file a petition for judicial review. KSU asserted that Crossland needed to file its petition for judicial review within 30 days of the date that Treanor rejected the shop drawings that included the Elevonic system in it. KSU asserted that this was when Treanor and KSU actually "formally rejected" Crossland's interpretation of the elevator specifications upon which Crossland's breach of contract claims relied on.

Treanor joined and adopted KSU's arguments. Treanor additionally requested that the trial court dismiss it from Crossland's claims because it was not a proper party to the lawsuit. Treanor argued that it was an improper party because Crossland's claims against KSU were barred under the KJRA and because Crossland lacked "contractual privity" with it. Thus, Treanor argued that Crossland "lack[ed] standing to bring a declaratory judgment action against it."

Otis and Liberty Mutual denied Crossland's claims against them. They also filed a counterclaim for breach of contract.

7

Crossland responded that the trial court should reject KSU's and Treanor's arguments about applying the KJRA for the following reasons: (1) Crossland argued that the KJRA had not been applied to construction contract cases before, and such application was not within the scope of the KJRA; (2) Crossland argued that Treanor's actions in the case could not be agency actions because Treanor was not an agency; (3) Crossland argued that KSU confused contractual procedures with administrative procedures while making its exhaustion of administrative remedies argument. Crossland also argued that even if the KJRA applied, it had exhausted its administrative remedies. Alternatively, Crossland asked that the trial court find that the administrative remedies available were inadequate under its contract. Last, Crossland responded that Treanor was a proper party to the lawsuit because of Treanor's financial interest and judicial economy.

The trial court granted KSU's and Treanor's motions to dismiss. First, the trial court concluded that the denial of PCO 126 was an agency action. Then, citing *Jones v. State*, 279 Kan. 364, 109 P.3d 1166 (2005), the trial court ruled that our Supreme Court had always required parties appealing breach of contract claims against a state agency to appeal under the KJRA. The trial court explained that because Crossland did not follow Article 16(G) after the denial of PCO 126, Crossland had failed to exhaust its administrative remedies. The trial court then rejected Crossland's argument that irreparable harm would result should it not allow Crossland's case to proceed. Last, the trial court concluded that Treanor was not a necessary party in the lawsuit, in part, because it had "barred Crossland's claims against KSU for failure to comply with the KJRA."

After dismissing KSU and Treanor from the lawsuit, this court denied Crossland's motion to docket an interlocutory appeal under K.S.A. 2017 Supp. 60-2102(c). When the matter returned to the trial court, Crossland, Otis, and Liberty Mutual agreed to

8

voluntarily dismiss their claims against each other without prejudice. The trial court then entered certification of final judgment under K.S.A. 2017 Supp. 60-254(b).

*Does This Court Have Jurisdiction?*

This court issued a show cause order, asking the parties to explain why this court had jurisdiction because "[i]t is well established that an order granting voluntary dismissal without prejudice is not a final judgment for appellate purposes." This court also noted that "[i]n absence of a ruling made under K.S.A. 2017 Supp. 60-254(b)," it would likely lack jurisdiction.

On appeal, Crossland argues that this court has jurisdiction to consider its arguments because it timely appealed following the trial court's entry of certification of final judgment under K.S.A. 2017 Supp. 60-254(b). Nevertheless, KSU and Treanor argue that this court lacks jurisdiction over Crossland's appeal.

*Applicable Law*

Whether jurisdiction exists is a question of law over which this court has unlimited review. *Wall v. Kansas Dept. of Revenue*, 54 Kan. App. 2d 512, 513, 401 P.3d 670 (2017). To the extent this court must interpret statutes, interpretation of statutes are also questions of law over which this court has unlimited review. 54 Kan. App. 2d at 513.

For purposes of this appeal, parties may docket an appeal with this court in three ways—under K.S.A. 60-2102(a)(4), under K.S.A. 60-2102(c), or under K.S.A. 60-254(b).

K.S.A. 2017 Supp. 60-2102 provides:

9

"(a) *Appeal to court of appeals as matter of right*. Except for any order or final decision of a district magistrate judge who is not regularly admitted to practice law in Kansas, the appellate jurisdiction of the court of appeals may be invoked by appeal as a matter of right from:

. . . .

(4) *A final decision* in any action, except in an action where a direct appeal to the supreme court is required by law. In any appeal or cross appeal from a final decision, any act or ruling from the beginning of the proceedings shall be reviewable. (Emphasis added.)

. . . .

"(c) *Other appeals*. When a district judge, or a district magistrate judge who is regularly admitted to practice law in Kansas, in making in a civil action an order not otherwise appealable under this section, is of the opinion that such order *involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation*, the judge shall so state in writing in such order. The court of appeals may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within 14 days after the entry of the order under such terms and conditions as the supreme court fixes by rule. Application for an appeal pursuant to this subsection shall not stay proceedings in the district court unless the judge of the district court or an appellate court or a judge thereof so orders." (Emphasis added.)

K.S.A. 2017 Supp. 60-254(b), on the other hand, states:

"(b) *Judgment on multiple claims or involving multiple parties*. When an action presents more than one claim for relief, whether as a claim, counterclaim, crossclaim or third-party claim, or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, *but fewer than all, claims or parties* only if the court expressly determines that there is no just reason for delay. Otherwise, any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." (Emphasis added.)

10

Thus, the plain language of K.S.A. 2017 Supp. 60-2102(a)(4) establishes that parties may use 60-2102(a)(4) to appeal only when all the issues in the case have been decided. Our Supreme Court explained: "The term 'final decision' has been construed to mean '"one which finally decides and disposes of the entire merits of the controversy, and reserves no further questions or directions for the future or further action of the court."'" *Kansas Medical Mut. Ins. Co. v. Svaty*, 291 Kan. 597, 610, 244 P.3d 642 (2010); see also *Henderson v. Hassur*, 1 Kan. App. 2d 103, Syl. ¶ 2, 562 P.2d 108 (1977) (holding that "[a] 'final decision,' as that term is used in K.S.A. 60-2102(a)(4) authorizing appeals as of right, is one which determines *all the issues in the case* and not just part of the issues." [Emphasis added.]).

During the pendency of a suit, parties may use K.S.A. 60-2102(c) to docket interlocutory appeals. Such appeals "require findings that are within the district court's discretion and acceptance of the appeal by the Court of Appeals, which is a determination within its discretion." *Jenkins v. Chicago Pacific Corp.*, 306 Kan. 1305, 1308, 403 P.3d 1231 (2017).

Last, parties may use K.S.A. 60-254(b) to appeal in actions "involving multiple claims" where judgment has been entered "upon fewer than all the claims but 'only upon express determination that there is no just reason for delay and upon an express direction for the entry of judgment.'" *Henderson*, 1 Kan. App. 2d 103, Syl. ¶ 3.

*Additional Facts*

Next, to fully address whether this court has jurisdiction, this court must first consider some additional facts. Those facts are as follows:

11

- On December 16, 2016, the trial court granted KSU's and Treanor's motions to dismiss Crossland's claim for declaratory judgment because Crossland failed to exhaust administrative remedies under the KJRA. The trial court also granted Treanor's motion to dismiss because it concluded that Treanor was not a necessary party in Crossland's lawsuit.

- After the trial court granted KSU's and Treanor's motions to dismiss Crossland, on December 30, 2016, moved the trial court to amend its order of dismissal to include findings under K.S.A. 60-2102(c) so Crossland could file an interlocutory appeal with this court.

- In January 2017, KSU, Treanor, Otis, and Liberty Mutual all filed motions opposing Crossland's motion to amend.

- Nevertheless, on January 26, 2017, the trial court granted Crossland's motion to amend. In doing so, the trial court made the following findings:

> "Pursuant to K.S.A. 60-254, the court finds that the order of December 16, 2016, involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation. Upon appeal, further proceedings are stayed."

Although the trial court stated "pursuant to K.S.A. 60-254," the actual language about "a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate terminate of the litigation" comes directly from K.S.A. 60-2102(c).

- On February 9, 2017, Crossland moved to docket an interlocutory appeal with this court under K.S.A. 60-2102(c). Crossland argued that the trial court correctly found that its December 2016 order "present[ed] a controlling question of law regarding the application of the [KJRA]." Crossland also argued that refusal to

12

take the appeal now "would waste significant judicial resources as well as significant financial resources of Crossland, Otis, and Liberty Mutual."

- On March 30, 2017, this court considered and denied Crossland's motion for interlocutory appeal. This court provided no explanation for denying Crossland's motion.

- On July 13, 2017, Crossland, Otis, and Liberty Mutual filed a stipulation with the trial court to dismiss their remaining claims and cross-claims against each other without prejudice. The stipulation explicitly stated that the parties reserved their "rights to appeal from the final judgment embodying the Court's Order of December 16, 2016 dismissing KSU and Treanor from this action."

- On October 9, 2017, Crossland, Otis, and Liberty Mutual collectively moved for dismissal of their claims and cross-claims against one another without prejudice. Crossland, Otis, and Liberty Mutual also requested that the trial court enter certification of final judgment under K.S.A. 60-254(b), as to the KSU and Treanor dismissal orders, arguing that there was no just reason for delaying Crossland's appeal.

- On November 13, 2017, the trial court held a hearing on Crossland, Otis, and Liberty Mutual's motion where all the parties, including KSU and Treanor, attended. At the hearing, in addition to arguing that the trial court should deny the motion because of the rule against piecemeal legislation, KSU asserted that on January 26, 2017, the trial court had already made "the requisite 254(b) findings to enable the interlocutory appeal." KSU and the trial court also discussed the reasoning behind this court's order denying Crossland's application to docket an interlocutory appeal. The trial court stated that it would "be pure speculation on [its] part as why the Court of Appeals didn't [take the interlocutory appeal]. It may have been they didn't think [the December 2016 order involved] a controlling issue and it may have been they didn't think [the December 2016 order] was a final order . . . ."

13

In making its arguments to the court, Crossland stated:

> "[KSU's counsel] was persuasive in arguing that [the first appeal] was merely interlocutory in nature, so the decision was to come back[. We] said okay, let's make it [the] final judgment that the Court of Appeals wants and we do that by dismissing without prejudice the claims and coming back to [the trial court], and . . . once [the trial court] accepts this, it goes up as a clean appeal to the Court of Appeals and we're going to get a ruling one way or the other[,] and we come back and one way or the other[.] [I]f we win on appeal[,] then we get one trial here with all of the parties[,] and we haven't wasted your time and a jury's time. If we lose them we still have one trial but it's against just Otis either here or in federal court, and it makes all of the sense in the world."

At the end of the hearing, the trial court took the parties' arguments under advisement.

- On December 5, 2017, the trial court granted Crossland, Otis, and Liberty Mutual's joint motion to dismiss their claims and counterclaims against one another without prejudice.

- That same day, the trial court entered an order of final judgment. The trial court "enter[ed] final judgment because all claims in this action [had] been dismissed either by Order of this court or voluntary dismissal pursuant to stipulation, which [had] been accepted by the Court." The trial court then held that a "decree of final judgement in this case pursuant to K.S.A. 60-254(b) [was] appropriate because Crossland's claims against Otis and Liberty Mutual and the corresponding claims by Otis against Crossland [had] been dismissed without prejudice and the Court's December 16, 2016 Order dismissed KSU and Treanor and there [was] no just reason for delay." The court explicitly held that it had "never entered final judgment in this case, or as to Crossland's claims against KSU and Treanor and [its] prior orders of December 16, 2016 and January 26, 2017 should not be construed as such."

14

*Jurisdiction Exists*

In their briefs, KSU and Treanor repeatedly argue that because Crossland, Otis, and Liberty Mutual voluntarily dismissed their claims against one another, the trial court's December 2017 order was not a final judgment. In its reply brief, Crossland concedes that the trial court's December 2017 order created no final judgment as to Otis and Liberty Mutual. Accordingly, in this respect, the parties agree; the trial court's order was not a final judgment as to all the parties in the case. This necessarily means that K.S.A. 60-2102(a)(4) does not apply here because the trial court did not make a final decision on all the issues in the case. See *Kansas Medical Mut. Ins. Co.*, 291 Kan. at 610.

This also necessarily means that an appeal by Crossland under K.S.A. 60-2102(c) is barred. Indeed, as noted by Crossland in its brief, all the cases that KSU and Treanor cite, while arguing that this court lacks jurisdiction because parties that voluntarily dismiss their claims without prejudice cannot create a final judgment for purposes of appeal, are actually cases involving interlocutory appeals under K.S.A. 60-2102(c). See *Brower v. Bartal*, 268 Kan. 43, 45-46, 990 P.2d 1235 (1999); *Hodge v. Hodge*, 190 Kan. 492, 492-93, 376 P.2d 822 (1962); *Scott v. Craft*, 145 Kan. 172, 173, 64 P.2d 10 (1937); *Arnold v. Hewitt*, 32 Kan. App. 2d 500, 503, 85 P.3d 220 (2004). Thus, these cases are not relevant for determining if the trial court properly entered a K.S.A. 60-254(b) certification.

Moreover, in its December 2017 order, the court ruled that it was "now enter[ing] final judgment because all claims in [the] action [had] been dismissed either by order of this Court or voluntary dismissal pursuant to stipulation, which has been accepted by this Court." For this reason, it entered K.S.A. 2017 Supp. 60-254(b) certification.

15

K.S.A. 2017 Supp. 60-254(b) certification applies only when there is more than one claim or multiple parties and the trial court "direct[ed] entry of a final judgment as to one or more, *but fewer than all, claims or parties . . . .*" Technically, because Crossland, Otis, and Liberty Mutual voluntarily dismissed their claims and cross-claims against one another, the trial court's December 2017 order was not final as to those parties and their claims. In short, K.S.A. 2017 Supp. 60-254(b) could apply.

KSU and Treanor, however, assert that Crossland is circumventing this court's order denying Crossland's motion to docket an interlocutory appeal. They emphasize that the trial court's reasoning and the status between the parties has not changed since the trial court entered its December 2016 order dismissing them from the lawsuit. KSU and Treanor believe that Crossland must proceed through completion of its case against Otis and Liberty Mutual before it has a right to appeal the trial court's dismissal of its breach of contract claims against them. In making this argument, KSU asserts that the law prohibits belated K.S.A. 2017 Supp. 60-254(b) certifications. To fully address this issue, we must consider the trial court's orders in this case.

Although it is unclear why the trial court referenced K.S.A. 60-254(b) in its January 2017 order, because the language the trial court used was from K.S.A. 60-2102(c), it is readily apparent the trial court allowed Crossland to file an interlocutory appeal under K.S.A. 60-2102(c), not K.S.A. 60-254(b). This is also supported by the fact that Crossland requested that the trial court make findings under K.S.A. 60-2102(c). Moreover, in applying to this court for interlocutory appeal, Crossland cited K.S.A. 60-2102(c) as its basis for appellate jurisdiction.

Kansas law also supports the interpretation that the trial court applied K.S.A. 60-2102(c) in allowing Crossland to appeal in its January 2017 order, regardless of the random reference by the court to K.S.A. 60-254(b). In *Prime Lending II v. Trolley's Real Estate Holdings*, 48 Kan. App. 2d 847, 852, 304 P.3d 683 (2013), for example, this court

16

explained that for a trial court to properly enter a certification of final judgment under K.S.A. 60-254(b), the trial court's order "must contain an express determination that there is no just reason for delay and an express direction for the entry of judgment before the order is considered final." Here, the trial court's January 2017 order contained no such language. As a result, it would be a novel, bordering on an absurd, interpretation to argue that the trial court's mere reference to K.S.A. 60-254(b) in its January 2017 order would have constituted a valid certification of final judgment under K.S.A. 2017 Supp. 60-254(b).

Next, we note that the December 2016 order resulted in the dismissal of Crossland's claims against KSU and Treanor based on Crossland's failure to comply with the KJRA. Based on the trial court's findings, Crossland had no further remedies against KSU and Treanor at the trial court level. Also, the circumstances between Crossland, KSU, and Treanor did not change between the trial court's December 2016 order, January 2017 order, and December 2017 order. That is, the trial court's reason for dismissing Crossland's claims against KSU and Treanor remained the same in December 2016, as it did in January 2017 and December 2017.

All the same, Crossland did not ask for K.S.A. 60-254(b) certification until October 2017, with the trial court entering K.S.A. 2017 Supp. 60-254(b) certification in December 2017. Thus, the question we are presented with is whether the trial court's December 2017 K.S.A. 60-254(b) certification was impermissible?

Our caselaw establishes that retroactive certifications are impermissible. This is an order by the trial court certifying that a prior order constituted a final judgment for purposes of K.S.A. 60-254(b). See *Prime Lending II*, 48 Kan. App. 2d at 854. Yet, in *Ullery v. Othick*, 304 Kan. 405, Syl. ¶ 1, 372 P.3d 1135 (2016), our Supreme Court explained:

17

"A certification of 'no just reason for delay' may be made after summary judgment is granted to fewer than all parties or on fewer than all claims. The filing date of the district court order or journal entry memorializing that certification starts the 30-day appeal clock, and a timely notice of appeal endows the appellate court with jurisdiction to determine the merits. K.S.A. 2015 Supp. 60-254(b) explicitly allows revision of nonfinal judgments, and K.S.A. 2015 Supp. 60-258 prevents any judgment from becoming effective until it is memorialized in a journal entry and filed with the clerk."

Thus, our Supreme Court concluded that the trial judge's certification of his original decision as an appealable judgment was proper and concluded that this court's dismissal of the plaintiffs' appeal was incorrect. 304 Kan. at 414.

The *Ullery* court's holding—that K.S.A. 2015 Supp. 60-254(b) explicitly allows revision of nonfinal judgments—is applicable to this case. For example, the judgment at issue in this case was nonfinal. Moreover, KSU and Treanor both concede this point. Thus, when Crossland moved the trial court to enter certification of final judgment under K.S.A. 2017 Supp. 60-254(b), the trial court could do so because that statutory subsection allows revision of nonfinal judgments. In turn, the trial court's certification of final judgment in this case became effective when it was filed with the clerk. This occurred on December 5, 2017. Thus, when Crossland filed its appeal with this court on December 29, 2017, it satisfied the prescribed 30-day appeal requirement. As a result, this court has jurisdiction to consider Crossland's appeal.

*Is Treanor a Necessary Party in this Case?*

When the trial court dismissed Crossland's claims against Treanor, it also addressed Treanor's argument that it was not a necessary party. The entirety of the trial court's findings and rulings based on Treanor's motion to dismiss because it was an improper party was as follows:

18

"Crossland argues [that] Treanor is a necessary party for two reasons. First, they were the author and party responsible for the accuracy of the project specifications and has a financial interest in the court's interpretation of the meaning of specifications. Second, for judicial economy.

"This court having barred Crossland's claims against KSU for failure to comply with [the] KJRA, eliminates any potential claim by KSU against Treanor. Even though Treanor's testimony may be required in the dispute between Crossland and Otis, that fact does not require [that] Treanor be included in this suit as a necessary party.

"Finally, it should be noted that it has not been alleged that Crossland and Treanor have any contractual obligation to each other. Therefore, Treanor's motion to dismiss is granted."

In its appellant's brief, Crossland fails to address the trial court's ruling that Treanor was not a necessary party. Thus, in its appellee's brief, Treanor argues that assuming this court has jurisdiction to consider Crossland's arguments, Crossland has abandoned its ability to challenge the trial court's alternative grounds for dismissal. See *Superior Boiler Works, Inc. v. Kimball*, 292 Kan. 885, 889, 259 P.3d 676 (2011) (holding that an issue not briefed by an appellant is deemed waived and abandoned). In its reply brief, Crossland concedes that it did not address the trial court's alternative reason for dismissing its claims against Treanor in its appellant's brief. But Crossland argues that it never needed to address the trial court's alternative reason because the trial court's conclusion that Treanor was not a necessary party hinged on its first conclusion that Crossland's claims against KSU were barred under the KJRA. Crossland bases its argument on the trial court's conclusion that "[t]he court having barred Crossland's claims against KSU for failure to comply with [the] KJRA, eliminates any potential claim by KSU against Treanor."

Nevertheless, reading this language in context establishes the trial court's ruling that Treanor was not a necessary party did not hinge on its first ruling that its claims

against KSU were barred under the KJRA. To begin with, the trial court's ruling that "[t]he court having barred Crossland's claims against KSU for failure to comply with [the] KJRA, eliminates any potential claim by KSU against Treanor" involves only KSU and Treanor as parties, *with no reference to Crossland*. That is, the trial court's ruling involves only the fact that *KSU had no claim against Treanor*. Indeed, the trial court's ruling can be broken down into the following syllogism: (1) If KSU does not have a claim against Treanor, then Treanor is not a necessary party; (2) KSU does not have a claim against Treanor; (3) Therefore, Treanor is not a necessary party. Clearly, the trial court made this ruling to refute Crossland's argument that Treanor's presence in the lawsuit was in the interest of "judicial economy." The trial court's ruling was distinct from its ruling that Crossland's claims against KSU were barred under the KJRA.

Next, Crossland ignores that the trial court also decided Treanor was not a necessary party because Crossland and Treanor had no contract with each other, meaning Treanor had no liability to Crossland as a private party. This point is of some importance because throughout this case Crossland has stressed the roles of KSU and Treanor, without addressing the role of the DOA. Significantly, Crossland sued Treanor in its individual capacity instead of the DOA. Yet, Crossland's contract with KSU stated that Treanor was retained and responsible to the Secretary of Administration and the OFPM. Moreover, Crossland has attributed contractual duties to KSU when those contractual duties belonged to the DOA.

Regardless, as it concerns Treanor being a necessary party, it is readily apparent that Treanor was not a necessary party. Treanor had no contract it could breach with Crossland. Moreover, because Crossland did not address the trial court's conclusion that Treanor was not a necessary party in its appellant's brief, Crossland has abandoned its ability to challenge the trial court's nonnecessary party conclusion on appeal.

20

*Does the KJRA Apply in this Case?*

Crossland's only argument on appeal is that the trial court erred when it dismissed its claims against KSU and Treanor for failure to exhaust administrative remedies under the KJRA. Highly summarized, Crossland contends that the KJRA only allows an agency to adjudicate claims within an agency's expertise. In the context of this case, Crossland asserts that because KSU is not an expert in contract disputes, Crossland had no duty to seek administrative remedies under the KJRA. Crossland also points out that there is no breach of construction contract case involving a state university where courts have applied the KJRA. As a result, Crossland maintains that the KJRA does not apply to breach of construction contract disputes involving state universities.

Crossland then argues that provisions in its contract with KSU could not invoke the KJRA. Thus, Crossland argues that the trial court erred by concluding that it failed to exhaust administrative remedies by not following Article 16(G) of its contract after the denial of PCO 126. Crossland also asserts, as an alternative argument, that this court should hold that it did not have to exhaust administrative remedies because doing so would cause irreparable harm. Finally, Crossland alleges that the administrative remedies provided under its contract were inadequate, mainly because it contends that KSU would have been biased while overseeing the appeal process.

Nevertheless, as correctly pointed out by KSU and Treanor in their briefs, the *Jones* case leaves no doubt that the KJRA requires a party to exhaust all administrative remedies available within an agency in a breach of contract case against a state agency before filing a petition for judicial review. *Jones*, 279 Kan. 364, Syl. ¶ 4. In addition, although the parties do not address this in their briefs, our Supreme Court's caselaw supports that parties may contractually include administrative remedies in their contract, which in turn must be exhausted before filing a petition with the trial court. See *NEA-Topeka v. U.S.D. No. 501*, 269 Kan. 534, 549, 7 P.3d 1174 (2000).

21

*Applicable Law*

Consideration of this issue involves two standards of review. First, when a trial court grants a motion to dismiss, this court reviews the court's granting of the motion to dismiss under a de novo standard of review. *Platt v. Kansas State University*, 305 Kan. 122, 126, 379 P.3d 362 (2016). But this court must accept facts alleged by the plaintiff, along with any inferences reasonably drawn from the facts alleged by the plaintiff, as true. 305 Kan. at 126. Interpretation of the KJRA involves a question of law over which this court's review is unlimited. 305 Kan. at 126. Second, this court exercises unlimited review over interpreting a contract, owing no deference to the trial court's interpretation of the contract. *Prairie Land Elec. Co-op v. Kansas Elec. Power Co-op,* 299 Kan. 360, 366, 323 P.3d 1270 (2014).

Under the KJRA, an "agency" means a "state agency." K.S.A. 77-602(a). K.S.A. 77-602(k) defines "state agency" as

> "any officer, department, bureau, division, board, authority, agency, commission or
> institution of this state which is authorized by law to administer, enforce or interpret any
> law of this state but does not include any political or taxing subdivision of the state, or
> any agency thereof, or the judicial or legislative branch of state government."

Next, "agency action" means: "(1) The whole or a part of a rule and regulation or an order; (2) the failure to issue a rule and regulation or an order; or (3) an agency's performance of, or failure to perform, any other duty, function or activity, discretionary or otherwise." K.S.A. 77-602(b)(1)-(3).

K.S.A. 2017 Supp. 77-603(a) provides that the KJRA "applies to all agencies and all proceedings for judicial review and civil enforcement of agency actions not

22

specifically exempted by statute from the provisions of this act." Neither KSU nor the DOA are exempted from the Act. Moreover, K.S.A. 77-606 states that the KJRA is "the exclusive means of judicial review of agency action."

Under K.S.A. 77-607(a), parties may bring a case under the KJRA only if they meet the following criteria: "(1) standing (K.S.A. 77-611), (2) exhaustion of administrative remedies (K.S.A. 77-612) and (3) time for filing the petition for judicial review (K.S.A. 77-613) . . . ." K.S.A. 2017 Supp. 77-612 states that "[a] person may file a petition for judicial review under this act only after exhausting all administrative remedies available within the agency whose action is being challenged and within any other agency authorized to exercise administrative review." There are exceptions to this rule. For purposes of this appeal, however, the only relevant exception is K.S.A. 2017 Supp. 77-612(d), which states that "the court may relieve a petitioner of the requirement to exhaust any or all administrative remedies to the extent that the administrative remedies are inadequate or would result in irreparable harm."

K.S.A. 2017 Supp. 77-613 provides the procedures for timely filing a petition for judicial review. If a party is seeking judicial review of an agency action, the party must file its petition for judicial review within 30 days of the agency action at issue. K.S.A. 2017 Supp. 77-613(d). Nevertheless, the 30-day period is extended "[d]uring the pendency of the petitioner's timely attempts to exhaust administrative remedies." K.S.A. 2017 Supp. 77-613(d)(1).

*Contract Provisions*

To adequately address the parties' arguments, this court must also consider several provisions of Crossland's contract with KSU. To begin with, "Owner" under the contract meant "the State agency, representing the State of Kansas, with whom the agreement with the contractor [was] executed." The project architect/engineer was either "employed or

23

designated by the Secretary of the [DOA] for professional services . . . or employed by the Owner . . . ." Moreover, the definition section of Crossland's contract defined OFPM and director. Under the contract, OFPM—"Office of Facilities and Procurement and Management"—was "a unit of the [DOA] of the State of Kansas authorized to administer, enforce or interpret laws relating to construction on state property." Director meant "the head of the [OFPM] and, under certain delegated authority, act[ed] on behalf of the Secretary of Administration."

The term "Contract Documents" had two meanings. First, "Contract Documents [were] complementary, and what [was] require[d] by one shall be binding as if required by all." Second, "Contract Documents" included several documents outside the contract itself, such as (a) part specifications, (b) change orders, and (c) "written clarifications" and "written interpretations by the Project Architect/Engineer which are made after execution of the Contract which [*were*] *not included* in Change Orders." (Emphasis added.)

Article 12 of Crossland's contract involved changes in work. Article 12(A) stated:

"No changes in the work covered by the Contract Documents shall be made without having such change executed in writing by Contract Change Order and approved by the Project Architect/Engineer, Owner, Director of [OFPM], *and* the Director of Accounts and Reports. Any change in work performed by the Contractor without signed approval shall be done at the Contractor's expense." (Emphasis added).

Article 12(C) provided that "[a] Change Order [was] the sole remedy for the contractor."

Article 14 governed subcontracts. Under Article 14(C), Crossland agreed to be "fully responsible to the Owner for the acts and omissions of [its] subcontractors . . . ." Under Article 14(E), Crossland agreed that its subcontractors would be bound by the terms of its contract with KSU.

Article 16 detailed the project architect's authority. As noted before, "[t]he Project Architect/Engineer [was] retained and [was] responsible to the Secretary of Administration and the [OFPM]." Article 16(A). When disputes arose about "the meaning and intent of any portion of the Contract Documents," the project architect "decide[d] the meaning and intent." Article 16(C). Moreover, the project architect was the interpreter of the conditions of the contract and the judge of its performance; "as such, he shall neither side with the Owner nor with the Contractor, but shall use his powers under the Contract to enforce its faithful performance by both." Article 16(E).

Last, under Article 16(G), "the Project Architect/Engineer's decisions [were] subject to review by the Director of the OFPM." Article 16(G)(1) provided:

> "All claims must be brought to the attention of the Director within ten (10) days of the Project Architect/Engineer's decision which is being reviewed. The Director or his designee shall meet with the Contractor and Project Architect/Engineer to hear the positions of both parties. The director may designate alternative procedures to receive and review the position of the parties. If a negotiation committee was assembled to select the Project Architect/Engineer, the director may delegate the decision making power to those individuals. The director, his designee or the negotiating committee shall render a decision within thirty (30) days of the hearing."

*KJRA Applies to Breach of Construction Contract Claims*

KSU's and Treanor's arguments why breach of construction contract claims must be brought under the KJRA are based largely on our Supreme Court's interpretation of the KJRA and holdings in *Jones*, as well as this court's interpretation of the KJRA and holdings in *10th St. Medical v. State*, 42 Kan. App. 2d 249, 210 P.3d 670 (2009), *rev. denied* 290 Kan. 1092 (2010).

25

In *Jones*, Jones was a foster child who lived with the Kress family. In August 1996, the Kresses' son sexually assaulted her. As explained in *Jones*:

"State law permits SRS to provide liability insurance for foster parents, see K.S.A. 75-5328a, and plaintiff alleges the Kresses had provided care for plaintiff in reliance upon SRS's agreement to obtain such insurance.

"The assault prompted plaintiff to sue the Kresses. During the pendency of that lawsuit, the Kresses and plaintiff learned for the first time that SRS had failed to name the Kresses as insureds on an Empire liability policy. Plaintiff took judgment against the Kresses in the amount of $100,000. The Kresses assigned to plaintiff any breach of oral contract action they would have for the failure to provide insurance coverage. The record on appeal contains no date for the filing of the lawsuit against the Kresses, no date for the entry of plaintiff's judgment against them, and no date for the Kresses' assignment to plaintiff.

"Plaintiff filed no administrative claim of any type. Rather, she pursued this independent declaratory judgment action, filing her amended petition on December 19, 2001. She alleged breach of contract against SRS in the first count of her petition and bad faith against Empire in the second count. On the breach of contract claim, plaintiff sought a declaration of the existence and validity of the contract to provide insurance to the Kresses; $100,000 in damages; and interest, costs, and fees. Only plaintiff's claim against the State is before us at this stage of the appeal.

"The district court ruled on the State's motion to dismiss that plaintiff had not exhausted her administrative remedies as required by the KJRA. It therefore dismissed the claim against the State for lack of jurisdiction." 279 Kan. at 365-66.

On appeal to our Supreme Court, Jones argued (1) that the KJRA could not be her exclusive remedy, and (2) that she had no responsibility to exhaust administrative remedies. Jones asserted that her claim involved the State's ability to provide retroactive insurance coverage. 279 Kan. at 366. Our Supreme Court disagreed.

Our Supreme Court held that Jones was "wrong when she characterize[d] the remedy she [sought] as retroactive insurance coverage." 279 Kan. at 367. Our Supreme

26

Court explained that her claim was clearly a breach of contract claim because she sought the enforcement of the insurance policy in which the State had failed to name the Kresses as the insureds. Then, our Supreme Court held that "[t]he KJRA was her exclusive avenue into court for a breach of contract action against a state agency." 279 Kan. at 367. Indeed, the entirety of our Supreme Court's holding was as follows:

> "In a case involving a breach of contract claim against a state agency, K.S.A. 77-612 permits a person to file a petition for judicial review under the KJRA only after exhausting all administrative remedies available within the agency whose action is being challenged and within any other agency authorized to exercise administrative review." 279 Kan. 364, Syl. ¶ 4.

Last, our Supreme Court noted that its holding mirrored the language of K.S.A. 77-606 in that the KJRA provided "the exclusive means of judicial review of agency action." The court continued that by holding (1) that SRS was an agency, (2) that SRS was not exempt from coverage under the KJRA, and (3) that the SRS' failure to provide its contractual duty constituted agency action under the KJRA. *Jones*, 279 Kan. at 367-68. Finally, because it was readily apparent that Jones did not timely file a petition for judicial review, our Supreme Court affirmed the dismissal of the claim against the State for lack of jurisdiction. 279 Kan. at 369.

We are also guided in this inquiry by the *10th Street Medical* decision. There, 10th Street Medical had a contract with SRS to provide Medicaid services. SRS told 10th Street Medical it was terminating their contract based on complaints. 42 Kan. App. 2d at 251. When 10th Street Medical appealed administratively and won, this resulted in the reversal of the termination of its contract with SRS in April 2001. Later, however, 10th Street Medical sued the State of Kansas and SRS in the Shawnee County District Court for breach of contract. The State and SRS moved for summary judgment based on a lack of jurisdiction, arguing that 10th Street Medical needed to bring its breach of contract

27

claim under the KJRA. 42 Kan. App. 2d at 251-52. The trial court granted the State and SRS' motion for summary judgment, and 10th Street Medical appealed to this court.

This court affirmed the trial court's dismissal of 10th Street Medical's breach of contract claim against the State and SRS. First, this court considered the *Jones* case holding in depth. 42 Kan. App. 2d at 254. Based on *Jones*, this court held:

> "A breach of contract claim against the State of Kansas, or one of its agencies, must be brought in a Kansas Act for Judicial Review and Civil Enforcement of Agency Actions proceeding if the action being challenged meets the statutory definition of 'agency action' and the Act does not specifically exempt that agency from its authority." *10th Street Medical*, 42 Kan. App. 2d at 252-53.

Then, this court used the analysis "set forth in *Jones*" to determine if the KJRA covered the agency action at issue. This court held that the breach of contract claim at issue concerned an "agency action" as meant under K.S.A. 77-602(b)(3) and that SRS was not exempt from coverage under the KJRA. *10th Street Medical*, 42 Kan. App. 2d at 253-54. Accordingly, this court held that 10th Street Medical's failure to raise its breach of contract claims administratively was fatal. 42 Kan. App. 2d at 256.

Highly summarized, the *Jones* court broadly held that parties with breach of contract claims against a state agency must bring their claims under the KJRA. In making its holding in *Jones*, our Supreme Court did not distinguish between the underlying subject of the contract, like insurance contracts, employment contracts, or commercial contracts. Parties bringing their breach of contract claims under the KJRA must comply with the KJRA's exhaustion and petition for judicial review requirements. 279 Kan. 364, Syl. ¶ 4. The *10th Street Medical* court relying on *Jones* reached the same holding. 42 Kan. App. 2d 249, Syl. ¶ 1. Moreover, our Supreme Court denied 10th Street Medical's petition for judicial review.

28

Despite our Supreme Court's broad holding that parties bringing breach of contract claims against a state agency must comply with the KJRA, Crossland asserts that this holding should not apply to breach of construction contract cases. Moreover, as noted, so does the Chamber of Commerce and the Associated General Contractors.

The first general argument that Crossland makes is that a review of the other breach of contract cases involving state universities establishes that those cases involved claims related to the university's expertise. According to Crossland, in prior university breach of contract cases, the agency was engaging in "agency action" as meant under the KJRA. But Crossland contends that in this case, KSU was not engaging in "agency action" because KSU has no expertise in the area of contracts.

At this point, it is worth noting that although Associated General Contractors has questioned whether the denial of PCO 126 constituted an "agency action" or an "order" in its brief, Crossland has never asserted that the denial of PCO 126 was an order as meant under K.S.A. 77-602(e). Instead, Crossland has only argued that the denial of PCO 126 was not an "agency action" as meant under K.S.A. 77-602(b)(3). Thus, any argument that the denial of PCO 126 was an order under the KJRA has been abandoned. See *Superior Boiler Works, Inc.*, 292 Kan. at 889. Even so, it is worth noting that under the assumption Crossland had an obligation to exhaust its contractually negotiated administrative remedies, the denial of PCO 126 could not be an order because *Crossland could have appealed the denial to the director of the OFPM under Article 16(G)*. See *Reifschneider v. Kansas State Lottery*, 266 Kan. 338, 341, 969 P.2d 875 (1998) (holding that an order under the KJRA must be the "final agency action" in an administrative case).

Furthermore, Crossland assumes that the denial of PCO 126 is the "agency action" of importance. Stated another way, it believes that if anything triggered its duty to exhaust administrative remedies, it was the denial of PCO 126. This is a very favorable view of the facts. Again, Crossland conveniently ignores that it submitted Otis' shop

29

drawings that included the Elevonic system to Treanor on April 3, 2015. Treanor rejected the shop drawings, interpreting the elevator specifications as requiring the installation of the iControl system that same day. It was Treanor's decision that the elevator specifications required the installation of the iControl system that created the controversy in this case. In turn, Treanor's denial of the shop drawings with the Elevonic system is the actual "agency action" in dispute.

Yet, given what has previously been said, in *Platt v. Kansas State Univ.*, 305 Kan. at 128, a case involving a retaliatory discharge tort claim, our Supreme Court rejected KSU's argument that the "language [in K.S.A. 77-602(b)(3)] should be read to cover all agency action, even if not connected to the central purpose for which the agency was established—and even if the action rises to the level of *tortious conduct*." (Emphasis added.) Thus, Crossland's argument that the KJRA applies only to agency actions related to the purpose of the agency has merit. Still, it is readily apparent that both Treanor's denial of the shop drawing with the Elevonic system and KSU's and Treanor's denial of PCO 126 constituted an "agency action" as complicated under the KJRA.

To begin with, under K.S.A. 2017 Supp. 76-721, the Legislature explicitly provided the board of regents and state educational institutions, like KSU, with the ability to contract. K.S.A. 2017 Supp. 76-721 provides:

> "The board of regents, or any state educational institution with the approval of the board of regents, *may enter into contracts with any party or parties* including any agency of the United States or any state or any subdivision of any state or with any person, partnership or corporation *if the purpose of such contract is related to the operation or function of such board or institution*." (Emphases added.)

Thus, the Legislature recognized that the power to contract was central to the functioning of state universities. Further, the construction of a residence hall relates to the operation and function of a university.

30

Additionally, Crossland has ignored that there was another "state agency" involved here. Crossland's arguments center on KSU's inexperience in the area of contracts. Yet, Treanor was involved in interpreting the elevator specifications and the denial of PCO 126. Crossland's contract with KSU clearly provides that Treanor was retained by and responsible to the Secretary of Administration. Moreover, *had Crossland complied with Article 16(G) of the contract*, Crossland would have appealed any issues with Treanor's decision to the director of OFPM. Once again, the OFPM is an office within the DOA. So we have two state agencies making decisions in this case—KSU and the DOA.

The DOA specializes in obtaining and negotiating contracts for state agencies. See K.S.A. 2017 Supp. 75-37,132 (contract negotiation requirements); K.S.A. 2017 Supp. 75-3739 (competitive bids and bidding procedures); K.S.A. 2017 Supp. 75-3740 (completive bids, preferences, and building contracts); K.S.A. 75-3744 (execution and approval of contracts). Indeed, negotiating and managing contracts for state agencies is one of the DOA's main functions.

As a result, Crossland's contention that the alleged breach of construction contract did not fall within the scope of the KJRA because KSU had no contract expertise is unpersuasive. Through K.S.A. 76-721, the Legislature provided KSU the ability to contract for items necessary to its central purpose. More important, Crossland's argument ignores that the DOA, an agency that specializes in contracting for state agencies, participated in the "agency action" at issue here.

Next, Crossland asserts that although no Kansas court has applied the KJRA to a breach of construction contract case, "there are a host of decisions where courts have decided cases involving breach of contract actions brought against state educational institutions and did not analyze claims under the context of the KJRA . . . ." Crossland cites four cases: *NEA-Coffeyville v. U.S.D. No. 445*, 268 Kan. 384, 996 P.2d 821 (2000);

31

*Chism v. University of Kansas Coll. of Health Sciences*, 237 Kan. 330, 699 P.2d 43 (1985); *MLK, Inc. v. University of Kansas*, 23 Kan. App. 2d 876, 940 P.2d 1158 (1997); and *Hayes v. Kansas University Athletic Corp.*, No. 91,140, 2004 WL 1542503 (Kan. App. 2004) (unpublished opinion). Crossland seemingly believes that because the KJRA was never mentioned in these four cases, this would establish that breach of construction contract cases do not fall under the KJRA.

Nonetheless, these four cases will not bear nearly the weight of reliance which Crossland places on them. For example, the *Hayes* case involved the Kansas University Athletic Corporation, now KU Athletics, which was a private entity distinct from the University of Kansas. Furthermore, as considered later, although the *NEA-Coffeyville* case is helpful in understanding how our Supreme Court treats contractually negotiated administrated remedies, the *NEA-Coffeyville* case involved a local school district. As a result, *NEA-Coffeyville* would not involve the KJRA. See K.S.A. 77-602(k) (definition of "state agency" excludes political or taxing subdivisions).

Of the remaining two cases, while *Chism* involves a breach of contract, it does not involve a breach of commercial or construction contract. Instead, it involves a breach of a scholarship contract. 237 Kan. at 332. Furthermore, the *Chism* decision is over 35 years old. Only *MLK, Inc.* involves breach of a construction contract. 23 Kan. App. 2d at 886. But this decision is over 20 years old, and it preceded *Jones* by eight years. In addition, because *MLK, Inc.* is a decision from another panel of this court, it is not binding precedent upon this panel. See *Graham v. Herring*, 297 Kan. 847, 861, 305 P.3d 585 (2013) (explaining that a panel of this court has the right to disagree with other panels of this court).

Furthermore, just because the *Chism* and *MLK, Inc.* decisions did not analyze breach of contract claims within the context of the KJRA affords no basis for saying that the KJRA cannot be applied to breach of construction contracts. For one thing, except in

32

limited circumstances, courts are limited to the arguments that the parties put before it. If, for example, the state agencies in *Chism* and *MLK, Inc.* never alleged that the plaintiffs' breach of contract claims fell under the scope of the KJRA, then an appellate court's opinion would likewise lack any reference to the KJRA. See *State v. Laborde*, 303 Kan. 1, 7, 360 P.3d 1080 (2015) (holding that absent exceptional circumstances, courts do not raise issues sua sponte).

Crossland also ignores that the *Jones* court relied on many breach of contract cases to support its broad holding that plaintiffs with breach of contract claims against a state agency must file a petition for judicial review under the KJRA after exhausting all available administrative remedies. 279 Kan. 364, Syl. ¶ 4. In deciding Jones' breach of contract claim with the State and SRS, our Supreme Court relied on three breach of employment contract cases and one breach of lottery contract case. Specifically, our Supreme Court cited the following cases:

> "*Schall v. Wichita State University*, 269 Kan. 456, 482-83, 7 P.3d 1144 (2000) (KJRA applied to contract action brought by employee against agency employer); *Reifschneider v. Kansas State Lottery*, 266 Kan. 338, 340-41, 969 P.2d 875 (1998) (plaintiffs could not bring separate contract action against Kansas Lottery when sole remedy was through KJRA); *Gaskill v. Fort Hays State Univ.*, 31 Kan. App. 2d 544, 546, 70 P.3d 693 (2003) (KJRA was professor's exclusive remedy for contract action against state university); *Douglass*[*v. Kansas State University*], 22 Kan. App. 2d at 173 (KJRA applied to contract action brought by university professor)." 279 Kan. at 367.

In short, Crossland's argument hinges on the fact that, as of yet, an appellate court has not applied the KJRA to a breach of construction contract case. But precedent establishes that when our Supreme Court actually considers a breach of contract, it has consistently held that plaintiffs bringing a breach of contract claim against a state agency must do so under the KJRA *regardless of the underlying subject of the contract at issue*. Indeed, our Supreme Court's holding in *Jones* could not be clearer:

33

"In a case involving a breach of contract claim against a state agency, K.S.A. 77-612 permits a person to file a petition for judicial review under the KJRA only after exhausting all administrative remedies available within the agency whose action is being challenged and within any other agency authorized to exercise administrative review." 279 Kan. 364, Syl. ¶ 4.

We are duty bound to follow our Supreme Court precedent absent some indication that our Supreme Court is departing from its previous holding. *Majors v. Hillebrand*, 51 Kan. App. 2d 625, 629-30, 349 P.3d 1283 (2015), *rev. denied* 303 Kan. 1078 (2016). Since our Supreme Court denied the petition for judicial review in *10th Street Medical*, there has been no indication that our Supreme Court is departing from its holding in *Jones*. As a result, we hold that the KJRA applied to Crossland's breach of contract claims.

*Exhaustion of Administrative Remedies Required*

Next, Crossland argues that assuming the KJRA applies, the trial court erred by ruling that it did not exhaust administrative remedies. Crossland believes that the trial court erred in reaching this conclusion for the following reasons: (1) because its contract with KSU did not create administrative remedies which needed to be exhausted; (2) because despite this problem, the trial court misinterpreted its contract when finding that it had not exhausted administrative remedies; and (3) because despite this problem, its attempts to settle the case with KSU and the DOA constituted exhaustion of administrative remedies. Nevertheless, each of Crossland's arguments fall short of the mark.

34

*Contractually Negotiated Administrative Remedies Enforceable*

Crossland's first argument is that contrary to the trial court's rulings, its contract could not create administrative remedies under Article 16(G). Instead, Article 16(G) was merely a contractual remedy. Crossland contends that the trial court confused its contractual and administrative remedies. Crossland also asserts that a contract cannot invoke the KJRA. Based on these contentions, Crossland argues it had no obligation to comply with Article 16(G) as a contractually negotiated administrative remedy, which it had to exhaust before petitioning for judicial review.

We pause to note that our Supreme Court has held that political and taxing subdivisions may contract for administrative remedies. Moreover, when parties contract for administrative remedies, they must exhaust those contractually negotiated remedies.

For example, the *NEA-Coffeyville* case involved a dispute between public school teachers, who were represented by NEA-Coffeyville, and the school district over a health insurance refund. 268 Kan. at 385. At issue was whether NEA-Coffeyville exhausted administrative remedies. The school district argued that NEA-Coffeyville failed to exhaust administrative remedies by failing to use the agreed-upon grievance procedures in its contract with the district. 268 Kan. at 389.

In making its decision, our Supreme Court noted that when administrative remedies are provided by statute, a party must exhaust those remedies before petitioning the court. 268 Kan. at 389. Our Supreme Court noted that this case was different because the parties negotiated the grievance procedures through a contract. 268 Kan. at 390. Our Supreme Court also emphasized that the "primary purpose of the doctrine of exhaustion of administration remedies is the avoidance of premature interruption of the administrative process." 268 Kan. at 389.

Nevertheless, our Supreme Court found "that the administrative procedure available to NEA-C was not . . . adequate" under the facts of the case. 268 Kan. at 391. Thus, the court held that NEA-Coffeyville did not have to exhaust administrative remedies before bringing its breach of contract claim in court. The court held this way because under the grievance procedures, the school district would not have acted as an impartial arbiter or in a quasi-judicial manner. 268 Kan. at 391. In making this holding, however, the *NEA-Coffeyville* court suggested that *adequate* contractually negotiated grievance procedures constitute administrative remedies that must be exhausted before bringing claims in court.

About six months after the *NEA-Coffeyville* decision, our Supreme Court explicitly reached this holding in *NEA-Topeka*. The *NEA-Topeka* case involved the same dispute between public school teachers and the school district over the health insurance refund at issue in the *NEA-Coffeyville* case. Nevertheless, *NEA-Topeka* was factually distinguishable from *NEA-Coffeyville* because it involved a different school district. Moreover, the *NEA-Topeka* teachers had a different contract with different grievance procedures. Thus, our Supreme Court distinguished the facts of *NEA-Topeka* from *NEA-Coffeyville* because the contracts at issue in *NEA-Topeka* had mandatory binding arbitration agreements, which it considered as "an available and adequate administrative remedy that [NEA-Topeka] was required to exhaust before litigating in the courts . . . ." 269 Kan. at 548. Our Supreme Court held: "Plaintiffs who contractually bargain for an available and adequate administrative remedy are required to exhaust that remedy before litigating in court over the interpretation or claimed violation of the contract." 269 Kan. 534, Syl. ¶ 5.

Although *NEA-Coffeyville* and *NEA-Topeka* involve political or taxing subdivisions, which do not fall under the KJRA, the cases are still relevant to our court's consideration of this case. Both involve whether parties can contract for administrative remedies. In *NEA-Coffeyville*, our Supreme Court recognized that the exhaustion of

36

administrative remedy created by a grievance procedure in a contract was different than that of an administrative remedy by statute. 269 Kan. at 390. Even so, in *NEA-Coffeyville*, our Supreme Court suggested that parties who contract for administrative remedies are bound by those remedies, if such remedies are adequate. More important, in *NEA-Topeka*, our Supreme Court explicitly made this holding. 269 Kan. 534, Syl. ¶ 5.

In its brief, outside of asserting that the trial court has confused contractual remedies and administrative remedies, Crossland provides no argument why this court should not apply our Supreme Court's holdings from *NEA-Coffeyville* and *NEA-Topeka* to this case. Indeed, although Crossland cites *NEA-Coffeyville* for other purposes, Crossland never addresses the holdings in *NEA-Coffeyville* and *NEA-Topeka* that support that parties can contract for administrative remedies. By not addressing these arguments in its brief, Crossland has abandoned any arguments about the application of these cases on appeal. See *Superior Boiler Works, Inc.*, 292 Kan. at 889.

In summary, the *NEA-Coffeyville* and *NEA-Topeka* cases establish that parties may contractually bargain for administrative remedies. Moreover, when parties contractually bargain for administrative remedies, parties must exhaust their contractually bargained for administrative remedies as long as those remedies are adequate. As a result, we must consider whether Crossland's contractually negotiated administrative remedies under Article 16(G) of its contract with KSU were adequate.

*Contractually Negotiated Administrative Remedies Adequate*

Crossland argues that the contractually negotiated administrative remedies were inadequate or would result in irreparable harm. Once more, K.S.A. 2017 Supp. 77-612 of the KJRA states:

37

"A person may file a petition for judicial review under [the KJRA] only after exhausting all administrative remedies available within the agency whose action is being challenged and within any other agency authorized to exercise administrative review, but:

. . . .

"(d) the court may relieve a petitioner of the requirement to exhaust any or all administrative remedies to the extent that the administrative remedies are *inadequate or would result in irreparable harm*." (Emphasis added.)

Crossland's argument why Article 16(G) provided an inadequate administrative remedy is that had it complied with Article 16(G), it would have had to appeal to someone else within KSU. Crossland asserts that there was no point in appealing to someone else associated with KSU because KSU was biased against it. Yet, this argument is wholly unpersuasive because Article 16(G) required that Crossland bring any claims about Treanor's decision *to the attention of the director of the OFPM*, not to some office within KSU. Moreover, as explained later, absent the director designating a negotiating committee to review the claim, KSU would not be involved in the review of Treanor's decision.

In addition, in making this argument, Crossland seemingly asserts that an agency is necessarily biased when it reviews a dispute that arose within its own agency. Kansas law, however, does not support this position.

Administrative appeals often involve parties appealing adverse rulings by one person or office in an agency to another person or office within the same agency. For instance, within the DOA, "[a]ny appointing authority may appeal any final decision of the director of personnel services to the secretary of administration by filing a written notice of appeal with the secretary . . . " K.A.R. 1-12-2. Kansas courts have consistently required parties to exhaust all available administrative remedies before filing a petition for judicial review. Kansas courts have not ruled that parties need not exhaust

38

administrative remedies simply because the agency that made the initial adverse decision was also the agency to which the party had to exhaust administrative remedies.

Instead, as shown in the *NEA-Coffeyville* case, the issue is the adequacy of the available administrative remedies. In its brief, Crossland argues that its contractually negotiated administrative remedies were inadequate because KSU—although it actually means the DOA—was not acting in a quasi-judicial capacity. Because Crossland believes that any decision by the DOA would have been motivated by its own bias, Crossland contends that it had no duty to exhaust administrative remedies. In making this argument, Crossland relies on *NEA-Coffeyville* and *Schmidt v. U.S.D. No. 322*, 24 Kan. App. 2d 643, 951 P.2d 960 (1997).

In *Schmidt*, this court held that because the school board did not act as an impartial body during a dispute, it was not acting in a quasi-judicial manner. Under the facts of that case, this court explained that the school board was acting as an agent on behalf of its principal and school district. 24 Kan. App. 2d at 647. In *NEA-Coffeyville*, our Supreme Court relied on *Schmidt* when finding that the grievance procedures in that case were inadequate. The *NEA-Coffeyville* court concluded that because the school district was not acting in a quasi-judicial manner, it was also not acting in an administrative capacity. This meant the teachers in *NEA-Coffeyville* did not have to exhaust administrative remedies before filing their petition with the court. 268 Kan. at 390-91. In summing up the analysis of *Schmidt*, our Supreme Court explained that if an agency "is not acting as an impartial arbitrator of a claim, its procedure is not administrative." 268 Kan. at 391.

A review of Article 16(G) establishes that Crossland's contractually negotiated administrative remedies were adequate because the appeal process under Article 16(G) was impartial. Once more, Article 16(G)(1) stated:

"All claims must be brought to the attention of the Director within ten (10) days of the Project Architect/Engineer's decision which is being reviewed. The Director or his designee shall meet with the Contractor and Project Architect/Engineer to hear the positions of both parties. The director may designate alternative procedures to receive and review the position of the parties. If a negotiation committee was assembled to select the Project Architect/Engineer, the director may delegate the decision making power to those individuals. The director, his designee or the negotiating committee shall render a decision within thirty (30) days of the hearing."

Thus, although a party must bring its claim to the attention of the director of the OFPM, the director may not necessarily hear the parties' arguments or make the ultimate decision. The language that "[t]he director may designate alternative procedures to receive and review the positions of the parties" is also key. Because Crossland never followed through with an appeal to the director of the OFPM, we will never know what alternative procedures the director may have chosen to put in place. But it is worth noting that the director, or the director's designee, could have requested the assignment of an administrative law judge to act as a presiding officer over the hearing under K.A.R. 133-1-2 (2017 Supp.), which states: "Any state agency head or a designee may request that the director [of the Office of Administrative Hearings] assign an administrative law judge to act as the presiding officer in an administrative hearing that is neither subject to KAPA nor listed in K.S.A. 77-551." KAPA would not apply because this was a contractually negotiated administrative remedy.

It is also worth emphasizing that Crossland was to appeal Treanor's decision to the OFPM. Although the DOA was undoubtedly involved in this case, especially because Treanor was responsible to the Secretary of the DOA, the OFPM's role was less direct than KSU. The OFPM was not involved in interpreting the elevator specifications as it concerned the installation of the iControl or the denial of PCO 126. Only KSU and Treanor were involved in those decisions. Crossland's and KSU's contract established that the OFPM's role was more for oversight. For instance, although the director of the OFPM

40

had to approve all changes in work along with KSU and Treanor, the director did not have to approve denials of changes in work. That is, once Treanor denied a PCO, nobody within the OFPM reviewed Treanor's decision unless Crossland appealed through the procedures under Article 16(G). See Article 12(A) and Article 16(G).

This is important because it means that whenever Treanor denied something, upon Crossland's appeal, the director or designee within the OFPM could act independently when reviewing Treanor's decision. The director or designee could, in fact, consider the parties' positions impartially because it had never dealt with these positions before.

It also seems there is only one situation in which KSU could potentially review Treanor's decision under Article 16(G). In some cases, a negotiation committee chooses a project architect. Documents in the record on appeal reveal that a negotiating committee selected Treanor. When the State needs "technical products," negotiating committees negotiate on behalf of the State. K.S.A. 2017 Supp. 75-37,102(c). Under Article 16(G), the director "may delegate the decision making power to [the negotiating committee]." The negotiating committee consists of the director of purchases, the chief administrative officer of the agency making the procurement, meaning someone from KSU, and the Secretary of Administration, or any of those persons' designees. K.S.A. 2017 Supp. 75-37,102(b). So in this instance, KSU would be involved in the decision making process.

Nevertheless, the negotiating committee structure seems more like a panel. This is additional evidence that the appeal process under Article 16(G) was supposed to be a quasi-judicial review of Treanor's decision. Further, regarding Crossland's concerns that the KSU designee would be biased by association, there would still be two persons on the committee from the DOA.

Concerning the actual review process, Article 16(G) states that the director or the director's designee must "*meet* with the Contractor and the Project Architect/Engineer to

41

*hear the positions of both parties*." (Emphases added.) Based on the plain language of Article 16(G), it is readily apparent that had Crossland filed a claim under Article 16(G), a physical meeting would have taken place. In short, this meeting would have been a *hearing* where the director or the designee had to *consider* the *positions* of Crossland and Treanor. The fact that the director or the designee had to consider the positions of both parties supports the premise that the purpose of the director or the designee was to act as an impartial arbitrator.

In its brief, Crossland asserts that since KSU alleged that it had failed to exhaust administrative remedies under the KJRA, it has now started exhausting its contractually negotiated administrative remedies under Article 16(G) "[o]ut of abundance of caution." Crossland points out that the person deciding its appeals under Article 16(G) is the deputy director of the OFPM. Crossland then points out that this is the same person who reviewed and approved 13 change orders throughout construction. Although not entirely clear, it seems that Crossland believes that because the deputy director had involvement in approving change orders, the deputy director must be a partial arbitrator.

Nevertheless, as already noted, any argument that parties appealing adverse rulings by one person or office in an agency to another person or office within the same agency are partial simply because it is the same agency is not supported by Kansas law. Moreover, the fact that the deputy director of the OFPM reviews and approves Crossland's change orders should not be news to Crossland because the deputy director's approval is required under a provision of its contract. See Article 12(A). In any case, the important point that Crossland has ignored is that the deputy director of the OFPM had no role in Treanor's interpretation of KSU's and Crossland's contract as it pertained to the elevator specifications or the denial of PCO 126. Thus, had Crossland timely appealed those disputes, the deputy director of the OFPM could have acted as an impartial arbitrator on those disputes.

42

In summary, Crossland's argument why it did not have to exhaust contractually negotiated administrative remedies hinges on Article 16(G) not providing adequate administrative remedies. Nevertheless, a review of the plain language of Article 16(G) establishes that had Crossland complied with Article 16(G), it would have provided adequate administrative remedies. This is because Article 16(G) was designed to create an impartial process where Crossland could administratively resolve its dispute. Thus, Crossland's argument that it had no duty to exhaust administrative remedies is unpersuasive.

*No Exhaustion of Administrative Remedies*

Having established that contractually negotiated administrative remedies existed, and that Crossland's contractually negotiated administrative remedies were adequate, we now consider if Crossland exhausted those administrative remedies. Assuming that this court rejected its previous arguments, Crossland asserts that it complied with the exhaustion requirements under Article 16(G).

First, however, Crossland rejects KSU's argument that it had to exhaust its administrative remedies following Treanor's rejection of the shop drawings including the Elevonic system. Crossland's sole argument why it did not have to exhaust administrative remedies following Treanor's rejection of the shop drawings as opposed to Treanor's denial of PCO 126 is that because its other arguments establish that "there were no administrative procedures for [it] to follow to review Treanor's decision under [Article] 16(G) or otherwise." Nonetheless, as considered at length, this was simply not the case. It also was Treanor's rejection of the shop drawings including the Elevonic system based on its interpretation of the elevator specifications that caused all the controversy at issue here.

43

As a result, Crossland should have begun exhausting administrative remedies after Treanor rejected the shop drawing on April 3, 2015. It clearly did not do so. Crossland therefore failed to exhaust its contractually negotiated administrative remedies.

Yet, notwithstanding the preceding problem, Crossland's contention as to how it exhausted the contractually negotiated administrative remedies following the denial of PCO 126 falls short of the mark as well. In short, Crossland contends that its contacts with KSU's and the DOA's attorneys in an attempt to begin alternative dispute resolution in May and June 2016 constituted exhaustion of administrative remedies.

Nevertheless, it is readily apparent that Crossland's contacts with KSU's and the DOA's attorneys during May and June 2016 did not constitute exhaustion of administrative remedies. Because the exhaustion of administrative remedies at issue in this case involves exhaustion of contractually negotiated administrative remedies, Crossland's contract determined how Crossland had to exhaust administrative remedies. As explained at length, Crossland's contractually negotiated administrative remedies were under Article 16(G). Nothing in Article 16(G) or any other provision of the contract suggested that discussions about alternative dispute resolutions with attorneys from KSU or the DOA constituted exhaustion of administrative remedies. See also *Walling v. Riggin*, No. 112,052, 2015 WL 3875085, at *2 (Kan. App. 2015) (unpublished opinion) (holding that writing letters to agency officials complaining about agency action not exhaustion). Thus, this argument fails.

*Miscellaneous Exhaustion Arguments*

Last, in its brief, Crossland argues that the trial court misinterpreted its contract in a couple of ways. Based on the alleged misinterpretations of its contract with KSU, Crossland argues that it had no duty to exhaust administrative remedies.

44

First, Crossland argues that exhaustion was not mandatory under Article 16(G); therefore, it did not have to exhaust its contractually negotiated administrative remedies. Crossland's contention is contrary to the plain language of Article 16(G), which stated that "[a]ll claims *must be brought* to the attention of the Director within ten (10) days of the Project Architect/Engineer's decision which is being reviewed." (Emphasis added.) The use of the word "must" under Article 16(G) triggered a right or entitlement on behalf of Crossland. The use of the word "must" means that Crossland would be eligible to resolve a claim if it brought it to the attention of the director within 10 days of the project architect's adverse decision. Thus, if Crossland was going to contest Treanor's decision, then it had to comply with Article 16(G).

Second, Crossland argues that because Article 12 specifically involved change orders, the trial court should have looked to only Article 12 about whether contractually negotiated administrative remedies existed. Then, because no grievance procedures existed under Article 12, Crossland argues it had no duty to exhaust administrative remedies.

When construing contracts, courts do not consider the provisions of the contract in isolation. Courts also avoid absurd results. *Waste Connection of Kansas, Inc. v. Ritchie Corp.*, 296 Kan. 943, 963, 298 P.3d 250 (2013). To accept Crossland's argument would require this court to misinterpret KSU's and Crossland's contract. Because Treanor had to approve or deny all construction related decisions, Article 12 and Article 16 must be read in unison. When Crossland applied for a change order under Article 12, but Treanor denied it, Crossland merely needed to consult Article 16(G) to discover its available grievance procedures. As a result, both of Crossland's arguments about the trial court misinterpreting its contract are unpersuasive.

Next, in its brief, the Associated General Contractors asserts that provisions like Article 16(G) are unenforceable. Thus, they need not be exhausted because the provisions

45

are contrary to K.S.A. 16-1903(b) of the Kansas Fairness in Public Construction Act, which states:

> "(b) The following provisions in a contract for public construction shall be against public policy and shall be void and unenforceable:
>
> (1) A provision that purports to waive, release or extinguish the right to resolve disputes through litigation in court or substantive or procedural rights in connection with such litigation except that a contract may require nonbinding alternative dispute resolution as a prerequisite to litigation."

Associated General Contractors' particular concern involves whether applying the KJRA to construction contracts waives or eliminates the otherwise five-year statute of limitations for breach of contract claims.

Nevertheless, requiring parties to bring their breach of construction contract claims against a state agency under the KJRA does not waive, release, or extinguish a contractor's right to resolve disputes through litigation in court. Instead, it merely requires the contractor to comply with an additional set of procedures—the procedures of the KJRA—before it may bring its breach of contract claims in court. Moreover, a review of K.S.A. 16-1901 et seq. supports concluding that the purpose of the Kansas Fairness in Public Construction Act is to establish financial procedures regulating construction contracts with public entities, not regulate whether contractors bringing breach of contract claims against a state agency must do so under the KJRA.

Indeed, the flimsiness of Associated General Contractors' argument is established by the fact that in addition to the Kansas Fairness in *Public* Construction Act, there is a Kansas Fairness in *Private* Construction Act. K.S.A 16-1803(b)(1) of the Kansas Fairness in *Private* Construction Act is identical to K.S.A. 16-1903(b)(1) of the Kansas Fairness in *Public* Construction Act. Simply put, had the Legislature intended for K.S.A. 16-1903(b)(1) of the Kansas Fairness in Public Construction Act to act as a sword,

preventing all state agencies from bringing contractors to court under the KJRA, it would not have needed to include the identical language in the Kansas Fairness in Private Construction Act. The fact that the same language exists in both Acts completely undermines the Associated General Contractors' contention that the Legislature enacted K.S.A. 16-1903(b)(1) to undercut the application of the KJRA.

In any event, this is the Associated General Contractors' argument, not Crossland's argument. Crossland has never argued that it did not have to exhaust its contractually negotiated administrative remedies under Article 16(G) because Article 16(G) was void against public policy based on K.S.A. 16-1903(b)(1) of the Kansas Fairness in Public Construction Act. By not raising this argument either below or in its brief, Crossland has now abandoned this argument. See *Superior Boiler Works, Inc.*, 292 Kan. at 889. Moreover, to the extent that Crossland has ever argued that enforcement of Article 16(G) would violate public policy, "[t]he public policy of a state is the law of that state as found in its constitution, its statutory enactments, and its judicial decisions." *Petty v. City of El Dorado*, 270 Kan. 847, 854, 19 P.3d 167 (2001). As considered, here, the statutory enactments of the KJRA and the caselaw of our Supreme Court support that Crossland needed to exhaust its contractually negotiated administrative remedies under Article 16(G).

*Timely Petition for Judicial Review Required*

Last, although the trial court dismissed Crossland's claims against KSU and Treanor because Crossland failed to exhaust administrative remedies, it is important to note that it could have also dismissed Crossland's claims because it failed to timely file its petition for judicial review.

"If a party has no administrative remedies available there is no additional requirement that the party exhaust its administrative remedies before seeking judicial

47

review." *Cochran v. Kansas Dept. of Agriculture*, 291 Kan. 898, Syl. ¶ 10, 249 P.3d 434 (2011). This means that when a party's claim falls under the KJRA but no administrative remedies exist, a party can immediately seek judicial review. Nevertheless, when a party has an administrative appeal, the party must still seek judicial review under the KJRA. This means that the party must petition a court for judicial review within the time limits stated under K.S.A. 2017 Supp. 77-613(d)—30 days after the agency action.

In the past, our Supreme Court has simply held that a party failed to timely petition the trial court for judicial review even when the trial court dismissed the party's claims below for failure to exhaust administrative remedies. For example, in *Jones*, the trial court held that Jones had failed to exhaust her administrative remedies when she immediately sued the State for breach of contract without trying to exhaust her administrative remedies. The *Jones* court upheld the trial court's ruling because under the facts of the case, no matter what, Jones did not comply with the requirement of K.S.A. 77-613(d) to timely file a petition for judicial review.

Our Supreme Court explained that based on the record, SRS necessarily breached its oral contract before Jones' assault occurred in August 1996. Given this fact, our Supreme Court found that it was "thus beyond obvious that 30 days have since passed many times over." 279 Kan. at 368-69. It seems that in *Jones*, our Supreme Court applied the right for wrong reason rule to uphold the trial court's ruling.

Assuming the relevant agency action was Treanor's rejection of the shop drawings with the Elevonic system in it, Treanor made this decision on April 3, 2015. Crossland did not file its petition with the trial court until July 8, 2016. As in *Jones*, it is readily apparent that 30 days passed many times over between Treanor's rejection of the shop drawings and when Crossland ultimately filed a petition with the trial court. Thus, Crossland's petition for review was untimely. Even if this court were to accept Crossland's argument that the denial of PCO 126 was the relevant "agency action,"

48

Crossland received notice from KSU that it had denied PCO 126 based on Treanor's recommendation on April 25, 2016. Thirty days after April 25, 2016, was May 25, 2016. But Crossland did not file the petition with the trial court in this case until July 8, 2016. Therefore, no matter what "agency action" this court accepts, Crossland's petition for judicial review was untimely under K.S.A. 77-613(d).

*Conclusion*

In conclusion, the *Jones* court's broad holding establishes that parties bringing breach of contract claims against a state agency must comply with the rules of the KJRA, including exhaustion of all administrative remedies before filing a timely petition for judicial review. 279 Kan. 364, Syl. ¶ 4. Our Supreme Court's cases *NEA-Coffeyville* and *NEA-Topeka* support that parties may contract for administrative remedies. Further, when parties contract for administrative remedies, parties must exhaust their contractually negotiated administrative remedies before filing a petition for judicial review with the trial court so long as their negotiated remedies are adequate. *NEA-Topeka*, 269 Kan. 534, Syl. ¶ 5; *NEA-Coffeyville*, 268 Kan. at 391.

Here, as a party suing a state agency for breach of contract, Crossland needed to comply with the KJRA. Moreover, because its contract with KSU contained a grievance procedure—Article 16(G)—and this grievance procedure was adequate, Crossland needed to comply with Article 16(G) before petitioning the trial court for judicial review. Against this backdrop, we conclude that Crossland never exhausted its contractually negotiated administrative remedies. We further conclude that Crossland failed to timely petition the trial court for judicial review.

Accordingly, we affirm the trial court's dismissal of Crossland's breach of contract claims against KSU and Treanor for lack of jurisdiction.

49